All right, we'll proceed to the final case of the day, Imungi v. VCU, and we will hear from the Appellate's Counsel, Ms. Cullen. Good morning, Your Honors, and may it please the Court. My name is Brianna Scholar, and I represent the Appellant Muthoni Imungi in her current appeal on a Title VII retaliation claim against Virginia Commonwealth University. There are two major points that I'll discuss today. The first is that Dr. Imungi established the third prong of her prima facie case based both on two factors, temporal proximity alone, and surrounding circumstances that are sufficient to infer a retaliatory motive, or rather, for a reasonable jury to be able to infer. The second topic that I will be able to address today is that Dr. Imungi has presented sufficient forms of pretext from which a jury may find that VCU's proffered legitimate business reason is pretextual. The first being the shifting reasons for the non-renewal of her appointment as the Director of Field Education. We have performance and then the vision of what the Office of Field Education will look like. We then have VCU's proffered legitimate business reasons contradictions between what it has reviewed Imungi as before previously, including Ingle herself, prior to Imungi's protected activity, and the performance reason, at least one of the reasons it has proffered, and the lack of contemporaneous documentation, and VCU's subjective criteria. A really good example of this that I'd like to point out before we move on is the lack of credibility here. If we look at Joint Appendix, page 791, we see a testimony from Ms. Whitney Brown, who was an HR representative that Dr. Ingle consulted with during the process of deciding not to renew Dr. Imungi's appointment. We see that following Imungi's protected activity, the question posed to Ms. Brown was, What's the next point in time that you recall either having a conversation or exchanging emails, just any kind of communication about changes to Dr. Imungi's role, specifically related to Dr. Imungi's job? Ms. Brown's answer is, The next thing I remember is in March, it wasn't necessarily a conversation in regards to the reassignment, but there was something concerning that was documented in the self-evaluation, and we talked about how this might impact the decision, or what the next steps would be, and who to get involved now that we have been made aware of this claim of discrimination. There we have a conversation with a human resources representative and the decision-maker, Dr. Ingle, wherein they're directly discussing Imungi's complaint of discrimination and what steps forward will be taken as it relates to her non-renewal. Moving forward to the Prima Fascia case in more detail here, just as a preliminary matter, Imungi need only present sufficient evidence that a reasonable trier of fact could infer that VCU's actions were retaliatory. As such, the court views all facts in a light most favorable to the non-movement, which here would be Imungi. In that context, the first topic is the third prong of her Prima Fascia case, and the first subtopic, if you will, is temporal proximity. Temporal proximity on its own in this circuit can be sufficient to create a causal connection, but it must be very close. However, what we have here—oh, I apologize. I thought you were asking a question. The relevant timeframe at issue is March 16th, the date Dr. Ingle became aware of the self-evaluation in which Imungi reported discrimination, to June 4th. That is the day that Dr. Imungi was notified that she was not going to be renewed. That is a total of 80 days. We know that as of February, no decision had been made as to not renewing Imungi's appointment as the director of the Office of Field Education. But she'd already been asked to resign, right? As it relates to Imungi being asked to resign, we have—Dr. Ingle's testimony specifically discusses that she didn't ask Imungi to resign, but rather suggested it because she believed that Imungi was not satisfied in her role. There's no implication there that she specifically asked Imungi to resign. But as it relates to any resignation request, at that point, yes, Dr. Ingle had approached her about potential resignation because— That was after Dr. Ingle had approached HR about possible removal, right? So before there's any protected activity, you have her supervisor talking to HR about not renewing and then asking her to leave. Yes, but at the same time, we have July of 2019, just about. That is when all these conversations I believe you're referencing are occurring. And then in October of 2019, we have Dr. Ingle requesting Cameron Carter's as well as Dr. Imungi's position descriptions. We also have at the same time Dr. Humberto Fabello, I believe is how you would say it, who Dr. Ingle also asked to resign, but actually requested that he stay on an additional year because she intended on changing the duties of the position. So as of 2018, Dr. Ingle testified that she had some concerns in the first two to three months. What did not occur in the first two to three months is any concrete activity that would make it easier to not renew Dr. Imungi's appointment. So when we're looking at just the temporal proximity, then we have the spring, right, spring of 2020, in which would be interpreted to be temporal proximity alone. But then we also have these sufficient additional circumstances. And so that includes February lack of decision, the March 16th protected activity timeline. We then have the conversation with Ms. Brown in March. But counsel, I guess I just want to kind of get to what I think at least the district court thought the heart of this was. We can assume for the sake of argument that between March 16th and June 4th, I mean, I think that's kind of outer edge for talking about temporal proximity, but let's just assume that's temporal proximity. But then you do have the Francis case that says that inference of causation is either entirely overcome or at least substantially weakened. And if before there was any protected activity, there was already consideration of letting this person go, or at least terminating this particular position. I mean, how do you deal with that? The fact that Dr. Engel was considering asking Dr. Imungi to resign, for example, does not equate to taking retaliatory actions in concrete steps in doing so. But I think that's their argument, that right, there were no retaliatory actions, because all there was was this very continuous serious consideration from before there was any protected activity until the end. Dr. Engel is actively pursuing the idea of removing your client to the point where she asks her to leave. After we have Dr. Imungi's protected activity, we have more than discussions with HR. That is really what we're seeing with the concrete steps. Specifically, we have April 13th, Dr. Engel requested Carter, and only Carter, put her concerns in writing, unprompted. And per Dr. Engel's request, we know that there wasn't a meeting, that Dr. Engel simply asked her to do this. That seems pretty much consistent with all of the other things Dr. Engel has been doing, thinking about whether to end this particular position. Sometimes she talks to HR, sometimes she asks Carter to gather information. It all seems of a piece. What happened here is similar to what happened in Sempowich. So there was the discussion as it relates to a potential, I believe in that case it was a transfer, a reassignment of duties. And after Sempowich, or excuse me, after the reassignment of duties, the individual participated in protected activity. After the protected activity, the supervisor took steps, concrete steps, to make it easier to fire that individual. So the difference here is not whether Dr. Engel was considering doing it at a previous time. In fact, that relates to the but-for causation at issue. Because it could be possible, not that that would in any way be conceded, but it is possible, right? And it is part of VCU's argument that Dr. Engel was considering and it was part of her decision. So how do we look at the evidence from Dr. Engel's deposition in which she says, I think I made the final decision in the spring of 2020, but I strongly considered it back in early December of 2019. What's the import of that? Well, strongly considering in December 2019 does not equate to actually doing it. It wasn't until after the protected activity that this took place. However, with the but-for causation standard, it's quite possible that there were other performance concerns. But that does not mean that the retaliation was not a but-for cause, which here it was. So just at Gorsuch, we have in Bostock a really great example of the car accident. We have the running the red light failing to have a turn signal here. And so whether Dr. Engel was considering removing Dr. Imungi after her protected activity based on these motives that she testifies to is, in fact, for the trier effect. Because that comes down to a credibility determination. You discussed quite a bit that business in 2019 in November about being given additional duties. How does that help you? When you say additional duties, can you clarify? Well, I mean, you're the one to have it in your brief. You discussed the decision about Dr. Engel being given additional duties in November 2019. Thank you. I'm asking you, how does that help you? Actually, what that does is demonstrate. So that was actually immediately after Dr. Engel asked Dr. Imungi to resign, colloquially. And so what we actually see there is Dr. Engel testified that one of those bullets, I believe it was that she was going to reach out to community stakeholders. Dr. Engel testified that that wasn't a priority for her, but she, in fact, included that for Dr. Imungi in November of 2019 so that Dr. Imungi could feel more satisfied in her role. And that also further demonstrates that Dr. Engel was not anticipating Dr. Imungi to leave. What we see there is that Dr. Engel is trying to satisfy Dr. Imungi's request for growth in a position, and I believe that's demonstrated for the additional duties and what she lists there in combination with Dr. Engel's deposition testimony. As to the pretext issue, how are you— the record is complete with testimony regarding your client being difficult to deal with, with complaints regarding her leadership style. How—I'm just trying to—I would be interested to see your argument regarding that, because even Dean, I think it's Davey, who did, I think, recommend her for a promotion, but also noted he acknowledged that there was issues with her leadership style and that he received quite a few complaints regarding her. Based on the pretext issue, I'm just—how do you— I mean, you're saying it's protectural, the reasons that they've given for her dismissal are protectural, so of course they've given, I guess, their non-protectural reasons or discriminatory reasons, and you have to be able to respond to that. Of course, yes. Well, first of all, the performance itself actually is only Dr. Engel's assertion. The VCU corporate designee testified that it was not necessarily related to her performance. Your Honor, I'm almost out of time. Would you mind if I finish answering your question? You may answer the question, please. Thank you. So as it relates to information in the record that asserts that my client was difficult to deal with or the appellant had a different leadership style, those are questions that run contrary or facts that run contrary to VCU's own actions. So you mentioned, Your Honor, that Tim Davey recommended Dr. Emungi for a promotion. That is correct. And in the record we have the promotion committee's glowing report as to Dr. Emungi's work. We have Dr. Davey serving as a letter of recommendation and even Dr. Engel's positive performance evaluation prior to the protected activity. So the official actions of VCU do not line up with what it now says there may have been performance issues about. Thank you, Your Honor. Thank you very much. We will hear from the appellee, Mr. Waddell. May it please the Court. Good morning, Your Honors. I'm Ryan Waddell here for VCU, the appellee in this case. There are a lot of factual issues that we disagree with. I think the record bears them out completely. But I think what's important to note and to start with is Dr. Emungi's July 11, 2019, performance evaluation. It's on page 264 through 266 of the JA, and I'm particularly looking at page 266 of the JA. In the top paragraph, Dr. Engel is doing a performance evaluation because she's a brand-new dean. Out of fairness to Dr. Emungi, she is judging her performance based on goals and expectations that Dr. Davey, who was the interim dean before her, had for her. But then at the first paragraph of page 266, she talks about, nevertheless, here are my expectations for you. And I think what's important there is it says working collaboratively with others should be and will be an utmost priority. And that was always Dr. Engel's critiques, comments, and suggestion, and what she wanted to see from everybody in her staff. And I think the record bears out that there were complaints before Dr. Engel was there. There were complaints when Dr. Engel first arrived, and they were related to Dr. Emungi's unwillingness to work with others, to collaborate with others. And Dr. Engel's entire thing was I need somebody in the Office of Field Education who's directing it and in all of my executive cabinet positions who aligns with my vision for the School of Social Work and the Office of Field Education. And the vision was to take VCU into the new era with online learning. There was a lot of online learning programs. And I think in October of 2019, there's a big problem because they create this new position that's the online master's program. And there's a debate between the director for master's studies and Dr. Emungi and this online coordinator position of who controls what. And Dr. Engel is like, you guys need to work collaboratively together. And I think those started additional conversations. And Dr. Emungi didn't like the fact that she was just like, they shouldn't have input on the field components of that because I'm the director of field education. And Dr. Engel and her talked about it and talked about this. And then Dr. Emungi expressed that she wasn't fulfilled in the role. And she said that she wanted to do something else. So she proposed creating a totally different role than the DOFE role. But she proposed that Dr. Engel do it in the spring of 2020. Dr. Engel said, why don't you put together a proposal? She commended her on it and she was just like, for a lot of reasons, we can't start a brand new program in the spring of 2020. So here's what I would like for you to do for the rest of the year in this office of field director position. If you are able to do that and willing to do that, you can stay on. If you don't want to do that, I can assign you to special projects if you'll agree to step down. Dr. Emungi decided, no, I want to do this. Dr. Engel gives her some expectations and tasks, all of which are directly from Dr. Emungi's job description, the office of field education position description. And then Dr. Emungi says, no, I don't want to do this. So she proposes her own Mathani immeasurable tasks, measurable tasks for herself. And some of them are as simple as adding a DocuSign feature to documents. And she doesn't do those. Did Dr. Emungi get a grant of additional money back in May of 2019 for her work in developing this online field education program? I wouldn't call it a grant, and she didn't develop it. It's called Noodle. Everybody who worked on putting courses together in this online site got a supplement, a pay supplement. Everybody did. And I think the record is clear with that. So I think to the extent that she created this, no. VCU School of Social Work created a whole online forum because they're starting like many schools at that time. And thank God they did because of the pandemic that was coming, which obviously we didn't know. They started to put everything online. And it was a massive project, and they wanted to put all kinds of different things online. And obviously, the field study component of those things has a lot to do with the curriculum. So they wanted Dr. Emungi's input and help us to put the course programs for these field components. And she did that, and she received a supplement for her extra work. And that's because it was extra work. She didn't have to do it. There was a statement made by one of the individuals who were opposed to you that maybe she was removed for something that was unrelated to her performance. She was removed as the DOFE for something, I think it was by Brown. Was there a statement to that effect that she was removed for something unrelated to her performance? No. And I don't know. And here's the thing. And I think that discussion between Dr. Angel and Whitney Brown hits the nail on the head. The decision was that we're not going to renew her. And I will get to your question, Your Honor, but if you look at Section M of the Terms and Conditions for Academic Appointments, it's on 429 of the JA. It talks about renewal, and it says that that should occur in June or July right before the term expires. So the decision was made, even though Dr. Angel said the final decision. But for all intents and purposes, she had talked to Whitney Brown and said, I don't think I'm going to renew her. Then she engaged in protected activity, and being thoughtful and conscientious of it, Dr. Angel says, what should I do? How does this impact me? Am I not allowed to ‑‑ like, what do I need to do? So she sends to Dr. Emungi the information of how to contact Equity and Access Services to file a complaint, to have an investigation. Dr. Emungi didn't do that for six weeks until after her non‑renewal decision, which was ‑‑ she didn't do it until July 22nd. But there was nothing ‑‑ it's not necessarily performance. Performance goes into it, but the record concretely establishes ‑‑ You're saying Brown didn't say that. It was not necessarily related to her performance. You're saying she didn't say that? Dr. Brown didn't say that? I don't believe that's in the deposition testimony. But what I'm trying to get at, Your Honor, is the record in all of it goes to concerns about Emungi's leadership style, inability to collaborate with others, unwillingness to perform tasks aligned with the vision. And her performance itself, that's hard to gauge. But her performance of not doing certain tasks, that is a component of it. But the larger component is her unwillingness to align with the dean's vision. And by not performing tasks that the dean is eligible to assign her to do that align with that vision, that's a problem. But at the same time, not collaborating with others is a problem. Not being a good leader for the office is a problem. And all of those things are in the purview of the dean. And it says that in the position description. It says that in the terms of academic supplemental appointments. And I think it's important to note, and counsel talked about a promotion, but this was a promotion from the rank of assistant professor to associate professor. And at all times, Dr. Emungi's faculty appointment contract, that's what governs her employment with VCU. She is still an associate professor of teaching at VCU. This supplemental academic administrator contract came with a $10,000 supplement and the title of director of field education. And the supplement was because you're going to be the director of this office of field education. But she's a professor and at all times had been a professor. And that is why these appointments are discretionary and at the pleasure of the dean. It has nothing to do on her actual appointment. Her job, the super majority of her salary is because she has a faculty appointment contract as an associate professor of teaching. So I think it's very important to take this idea of removing her versus non-renewing her supplemental academic appointment after it expired. There's nothing wrong with that. And the terms for doing academic administrative appointments say the time to give notice is in June, July, right before the expiration of the term. So that by itself erases this inference of it's because of her protected activity. And I will say this case is not at all like Semplewich. It is exactly instead like Francis because they're in Semplewich for two reasons. First, Semplewich didn't get to the pretext part of it, but Semplewich still says temporal proximity to establish a causal connection at the first prong of McDonnell Douglas. If you do that, the burden shifts to the employer to articulate legitimate, non-retaliatory, non-discriminatory business reasons. But then Semplewich still says then the plaintiff needs to prove pretext, which in this context requires showing that the profit reasons are untrue and that the but-for cause was her protected activity. But Semplewich should not be applied. And I'm not saying that there are not any cases ever where temporal proximity isn't strong enough to create an inference of retaliation. But not in this case. And in Semplewich, the decision is different because there the adverse action didn't begin well before she engaged in protected activity. And it contrasts Booz, Alan Hamilton, and Francis where the timing was the only basis that the plaintiff had and gradual adverse actions began well before they ever engaged in protected activity. And I think Judge Harris hit the nail on the head and that is what Judge Hudson focused on because when the only thing that you have in a case is temporal proximity. And I will say the only thing because there is nothing in the record. And she admits it in her statement of facts and she implicitly admits it by not appealing the discrimination finding. There's nothing in the record that challenges that or that posits that VCU's articulated business reasons were false. And that's what we need to have for retaliation. But when you only have temporal proximity in a case like this without other evidence, that is when the court should apply Francis. And I will say that, again, the temporal proximity and the causal connection piece only goes to the first prong. You still have to show but-for causation. And that's bared out in the text of Title VII's anti-retaliation itself. It uses the word because twice. Because they engaged in protected activity or because they participated in the process of an investigation. And the word because is significant and it's different than the actual text of the standalone discrimination piece which says based on. Because means what it means. And this court in Maryland Eastern Shore is my favorite recitation, has said that in order to show because but-for causation and to prove pretext at the third prong of McDonnell Douglas, a plaintiff has to show that the employer's proffered reasons are false and that the retaliation was the real reason. Here, there's nothing in the record to show that any of the many explanations that VCU has proffered, all of which have to do with not aligning with Dean Angel's vision, are false. And- The district court's explanation for why there's not a promise basis case here is basically two sentences. And he essentially says that it fails because she admits that he asked her to resign in the fall of 2019. And that that admission alone eliminates any inference of retaliation based on temporal proximity. Is that the case? That she was asked to resign or is that in the fall of 2019? That can be the case, Your Honor. I didn't ask what it can be, but is it? Because we're dealing with issues of fact here. So you're asking me if the case was that she was asked to resign? Is that sufficient in terms of the reasoning for a district court to say there's a failure of establishment of a prima facie case? Two sentences here that says that. Is that the full story? That is sufficient because the other 24 pages talk about the legitimate non-discriminatory business reasons. And I would say that it's important because, as the court is well aware, the burden for proving pretext at the discrimination stage is much less than proving pretext at the retaliation stage. Dr. Angel said in a testimony that she only made that decision to remove her in the spring of 2020. I mean, how do you get to the Dr. Angel asked her to resign in 2019? She did ask her to resign, and that's not disputed. But there's a difference, I think, between asking someone to resign. But what we're dealing with is what is the protective activity here, and when is the date on which one was asked to resign or put in a position to resign? I think what the court said is that because the protective activity was March 8th, but because Dr. Angel had already discussed removing her from the position before that, it eliminates an inference of temporal proximity, and that goes to the exact rationale spoken to in Francis where the adverse action began before the protective activity. So that's where the district court was going. But the next sentence says, and she still loses because she can't establish but-for causation. And that in itself is fatal by itself. That sentence that he uses here, this submission alone, eliminates any inference of retaliation based on temporal proximity. It does, but I think it's important for the court to note that creating an inference of retaliation, that only applies to the first prong of McDonnell Douglas. Because once you create an inference, then the burden shifts to the employer to articulate legitimate non-discriminatory business reasons. And then the ultimate burden shifts back to the plaintiff to show that- We're aware of the framework because we do have a pretextual issue here too, but I'm only dealing with just the basis upon which the district court judge relied upon to establish there was no prima facie basis set up here. That's one basis, and then the next sentence is another basis, and they're independent justifications. He says it alone is the reason. The submission alone eliminates. Eliminates an inference, which would preclude her from establishing the first prong of McDonnell Douglas. And then the next sentence, which I believe this is holding, is that her retaliation claim fails as a matter of law because VC articulated legitimate non-discriminatory and non-retaliatory business reasons to support the dean's decision not to renew her supplemental appointment. That next sentence is the holding. But the first sentence is, if you can't establish an inference, and you have to because there's not direct evidence of retaliation, you lose. You still lose as a matter of law because even if you could establish an inference, you haven't challenged our legitimate non-discriminatory business reasons. And to do that, the standard and the law in this court is that she has to show that the reasons are false and retaliation is the real reason. Everything in the record supports that Dr. Angel, from July of 2019, stressed to her, collaborating with others is essential, doing these tasks is essential. And if we go back to 266, the very last sentence of the first paragraph talks about, I would like to see you get involved in the community and add more placements and build more relationships. None of that is different than any of the things that Dr. Angel continued to tell her throughout the entire 2019-2020 academic school year. And then Dr. Emungi, who every year, performance evaluations, self-evaluations at the same time, and then she says in two lines on the last page, I feel that my leadership role has been diminished because of the color of my skin. Dr. Angel immediately says, here are the resources for equal access. But at the same time, Title VII's anti-retaliation provision doesn't immunize employers from continuing to evaluate strategic decisions, and it doesn't immunize employees from continuing to do what their supervisor says. And I think what's very important here is that I think the protective activity occurred on March 8th. One week later, I think from my memory, is when COVID happened. And actually, this is not just, everything started to change. Everything started to shut down. Like the rest of the world, VCU had to send thousands and thousands of students home, and everybody had to figure out what is going on. So aside from Dr. Angel's original new vision of where she wanted to take it, she had an immediate, I need to deal with this. We all need to deal with this. We need to work together. And that's why the Cameron Carter things came up, because people were complaining about her that she wasn't working with them. They needed to get on Zoom meetings during the pandemic, because they couldn't go meet with each other, and she wouldn't participate. She asked for an ombudsman for these online coordinator positions in April. And Dr. Angel is sitting there, and she's like, this is the time where I need everybody to be flexible. And she talks about that in her deposition. Before and after, there's this rigidness, this inflexibility, this unwillingness to work with others to do what we need to do. And in the COVID context, it's not just what I want to do for my vision as the dean, but it's like what we need to do for the students. And the record is in there, and it's replete of her questioning whether they should let students during the pandemic have relaxed criteria to finish their placements. Now, our review of the evidence here in the record, is it in a light most favorable to Mrs. Imoni? It is in a light most favorable to Dr. Imoni. And when there was a statement from Dr. Angel that she made the decision to release her in the spring of 2020, is that not in a light most favorable to her, that that would be the time she was released? The time she was released was when she was not issued a renewal contract. And she wasn't released, again, I think it's important, her contractual term expired. What about the time in which Dr. Angel made the decision that she would terminate her? She says it's the spring of 2020. Her deposition says that. In a light most favorable to the non-moving party here, is that not the date on which we should consider? You can consider that, and I think that there was plenty of intervening instances that all aligned before that showed why she did that. We're looking between the dates, between the date of the temporal proximity question here that comes to mind. It seems to be somewhat important as to whether that date is then or whether it is earlier. I don't think it's that important when the date. You don't think temporal proximity makes a difference in this case? It does not. You don't think it makes a difference in any case? I think it makes a difference in some cases. We have not held so that even a two-and-a-half-month difference can make a difference in a case. It does for establishing an inference. We held that. That it can make a difference? Yes. Yes, you have. At the first prong of McDonnell Douglas, and it doesn't make a difference in this case because the record does not show that she has proved the many, many reasons why VCU made its decision are false and that her protected activity was the real reason. I will say this. The law, Title VII's anti-retaliation provision, has not and should not ever be that I engage in protected activity and you do anything after within two months, you're not allowed to do that.  Thank you, Your Honors. Let me ask if the counsel has any questions. Thank you very much for your time. Thank you very much. Ms. Scully, you've got a few minutes. I believe counsel phrased it perfectly when he first approached it, noted that there were many factual disagreements. I would agree. There are many disputes of material fact, genuine disputes of material fact in this case. Well, okay, you have it in a light most favorable to you. Tell us what those facts are from the way he articulates them and the way you articulate them. Sure. And move beyond the prong one into the causation aspect of it. I think there's something entwined in there, but we'll see. So just a couple of factual corrections as it relates to viewing the facts most favorably. As it relates to Ms. Brown's deposition, you were correct that the witness is Ms. Brown. She is the corporate designee in this deposition, so it's the 30B6 deposition. And that starts with, in late fall 2019, DeAngle reached out to Whitney Brown in HR that she was considering... This is Joint Appendix 814. If I didn't say that, I apologize. ...that she was considering changing Dr. Imungi's position, and the reason was primarily because Dr. DeAngle's vision of the School of Education did not align with Dr. Imungi's. Is that correct? Yes. Question. And Dean DeAngle coming to Whitney Brown in HR was not necessarily related to Dr. Imungi's performance. Yes, to my recollection. We then have a quick correction on the narrative. So counsel reiterated what happened as Dr. DeAngle made a decision to not renew Dr. Imungi's appointment, and then Dr. Imungi engaged in protected activity. From the record, we know that is not the case. We know that in February there was no decision. We know that in May there was no decision. And we also have the 30B6 representative on the next page saying that the decision to remove Dr. Imungi from her position of director, the non-renewal, it was on June 4th, which is when the contract was issued or the notice was given. Dean Angle made the decision to reassign her around that time. It was not that Dean Angle had made that decision and then Dr. Imungi made this protected activity. As it relates to the performance evaluation, Dean Angle, if my math is right, had already worked at VCU for a year. Her testimony is that she did not feel that it was fair to give Dr. Imungi an incorrect performance evaluation on different goals. As it relates to the pretext argument here, first of all, this Court has recognized that evidence that creates a causal connection can also go towards a pretext analysis. But we also have demonstrable evidence from Dr. Davey, for example. Can I ask you a question? Sorry, if we're moving off performance. I did want to ask you about this. So the district court, in considering the disparate treatment claim, finds, as a matter of law, the record establishes that Dr. Imungi is not meeting the dean's legitimate job expectations, and you're not appealing on the disparate treatment side. So do we just take as a given that you're not meeting the legitimate performance expectations because you haven't appealed that? The appeal of the retaliation claim is de novo. That's the standard of review, right? But the legitimate expectation, so to speak, is not a prong of the prudent question case here. No, I'm just trying to figure out what I do, because as your colleague on the other side said, there's a bunch of pages before we get to retaliation where the judge is going through at much more length, here's the record evidence on performance, and I am finding that, as a matter of law, didn't meet the legitimate job expectations. And I guess I'm asking, what do I do with that, given that you're not appealing that part of the decision? You can disregard it to the extent that it doesn't have to do with the findings of the retaliation claim. Yes, because it certainly goes to pretext. It can go to pretext to the extent that the CU is asserting that it's due to Mungi's performance, which here, that's only one portion of it, and could still be a but-for cause of retaliatory motive. Okay. So can you show us in a record, because the argument of opposing counsel is that you have not put forth anything to show that their legitimate nondiscriminatory reason is false? Sure. Show me in the record what facts you cite to show that those are false. So if you pull up Joint Appendix 762, that is the beginning of the report with the VCU Peer Committee, I apologize, I've run out of time. May I continue answering your question? Yes, of course you may. Thank you. You can also look at Dr. Davies' testimony, and that's going to be at... Joint Appendix 691 is where it starts, but he discusses the leadership of the VCU. We also have additional objective evidence. So we have the noodle, as it's called, performance additional supplement, the monetary supplement for all of Emungi's hard work, for which Dr. Engel herself emailed Emungi and said thank you so much for all of your hard work here. There is also the fact of even when Dr. Emungi proposed creating an additional position that she felt would grow her career at VCU, Dr. Engel herself commended on it for being well-researched, and there are extensive positive student feedback contained in the VCU Peer Commission as well, in addition to the fact that she was promoted. In 2018, had a good performance review from Dr. Engel, at which point she was there for a year, and then later on these statements, these actions changed. Thank you. And for those reasons, Your Honors, I request that this court reverse and remand for trial. All right. I want to thank counsel for your argument today. The court will adjourn, and then we'll come down and then Greek counsel will adjourn for the session. This honorable court stands adjourned and sign a diagos of the United States and this honorable court.
judges: James Andrew Wynn, Pamela A. Harris, DeAndrea Gist Benjamin